## ROWAN v. WESTERN KENTUCKY GAS CO.

No. 349.

United States District Court
W. D. Kentucky.
Owensboro Division.

Feb. 15, 1949.

Robertson & James and Woodward, Bartlett, Hobson & McCarroll, all of Owensboro, Ky., for plaintiff.

Anderson & Anderson and Byron, Sandidge, & Holbrook, all of Owensboro, Ky., for defendant.

SWINFORD, District Judge.

Beulah Mae Rowan, a Negro woman thirty-eight years of age, occupied a house in Owensboro, Kentucky, in which there were no gas fixtures and to which there were no gas pipes. The closest gas pipe to her residence was the main of the defendant company in the street to which her house was adjacent. This gas main was about 14 feet from her house and about four feet from the sewer pipe which was between the gas main and the house.

On the occasion set forth in the action she struck a match to light the paper, kindling and fuel in her cook stove. An explosion occurred and she was burned to such an extent that she died within four days.

An examination of the premises by the gas company revealed within the house the presence of gas of sufficient quantity to cause an explosion and several holes from which gas was escaping in the gas main opposite the house. The holes were the size of a nickel, dime and quarter of which there were seven or eight. The presence of gas was discovered principally in the bathroom around the fixtures, but also in the kitchen where the deceased was standing at the time of the explosion.

The holes in the gas main were repaired and afterward no gas in explosive quantities was found in the house or on the premises.

There was no positive proof of any routine or even irregular inspection of the gas line at this location. In fact, there is nothing in the evidence from which the Court could draw a reasonable inference that it had ever been inspected. There is proof that an explosion had occurred in this same property about a month before in which a child had been severely injured. A local newspaper account of that incident gave more or less details, but there is no proof that the defendant or any of its officers had the matter brought to their attention.

Realizing that the law imposes certain duties upon sellers of gas the Court sought to elicit from officers of the company when if ever an inspection had been made. An examination of the witness G. L. Bugg, Vice-president and General Manager, shows how vague the defendant was on this point.

"The Court: What is considered by the trade as the life of a main gas line, like that one was, in this locality—or rather in this town on that street? A. It would depend entirely upon location and soil conditions.

"The Court: I mean taking the soil condition as it was. A. Well, we consider it 33 years. We depreciate our system on a basis of three per cent—33 years as the average life.

"The Court: Do you give any closer inspection or is there any standard of conduct to lines that are, say, fifteen, sixteen years old, seventeen years old, over new lines? A. Not until you have had some indication of leakage. We cover the majority of our mains each year with what is known as a vegetation survey. They are supposed to be experts on locating gas leaks by noting the color of the ground, the color of the soil, the type of the soil, the vegetation—whether it is dead or not and the degree of deadness.

"The Court: There are modern scientific methods of making those inspections and ascertaining whether or not there is substantial leakage? A. That is true, and we use them every year—not over our entire system or all of our towns, but rotate them more or less so that they cover practically all towns every year or two.

"The Court: Do you recall when, if any, there had been any inspection made of the system here in Owensboro with respect to before your company took it over? A. No, sir, I do not know the year. They were here. The only way I know about it is when the boys came down to do the work for us, they said that they had been in Owensboro before, but I had no charge of it."

It was further brought out that this line had been laid in 1929 or 1930.

The defendant takes the position that the explosion was caused by sewer gas rather than natural gas. It is going rather far to ask the Court from the record before it to accept this theory. There is no proof of any fact that would lead to such a conclusion. Of course, it is incumbent upon the plaintiff to establish his case on the ground of negligence and not required that the defendant produce any theory. Nevertheless, there was a gas explosion. It must have been one or the other so the defendant advances its theory of sewer gas. I cannot accept such a conclusion from the record.

Without detailing the evidence or reasoning from all angles how this gas got from the line to the point of explosion, suffice it to say that in my judgment it did get there, either through the ground, by the sewer or along the intake plumbing fixtures. I am convinced from the evidence and all reasonable inferences which may be drawn from it that the explosion was caused from natural gas which had escaped from the main line and that the deceased was the victim of the defendant's negligence. in properly maintaining its lines.

Gas, like electricity, is easily subject to control and of inestimable usefulness in the hands of those who know its propensities. To the great masses of people it is a deadly instrumentality incapable of perception of its presence until that presence is made known by calamity or tragedy from explosion or fire. Thus the law should and does place upon those who handle gas an obligation to handle it in such way that it is harnessed for benefit to the purchaser and profit to the seller. The "ordinary care" required is not the care of an ordinary person for the average person knows nothing of how to handle gas. Ordinary care in this instance means ordinary care by people learned in the handling of gas.

The law applicable to this case is expressed in the following quotations from Thornton on Oil and Gas, Volume 3, Sections 1092, 1093, 1094 and 1107.

"A gas company is bound to know the consequences that will probably follow its act of negligence; as, for instance, the use of defective pipes and the turning of gas into them, especially at a high pressure. In an instance of use of such pipes and the maintenance of a high pressure, and gas escaped and an explosion followed, it was said that it was not necessary to charge in the complaint that the gas company had special knowledge or notice of the happening of such consequences flowing from its original negligence, in the order in which it occurred."

"A gas company is chargeable with notice of the fact that gas pipes and mains are liable to rust and decay, and by reason of such rusting or decaying permit gas to escape. They are also chargeable with notice of the liability of pipes and mains laid in streets to become broken by reason of the travel in the streets or of the settling of the earth, especially when sewers have been or are being constructed or other pipes laid therein, or the streets are being repaired. And in these modern times when the use of electricity has become so universal there is no doubt that they are chargeable with notice of its effect upon iron or steel pipes and its tendency to destroy the fibres of the iron or steel, weaken the pipes and render them unsafe instruments for the conveyance of gas. Being thus chargeable, a duty devolves upon gas companies to inspect their pipes and mains and the connections therewith. It must use reasonable care in making these inspections; and if a leak could have been discovered and prevented by such an inspection, that fact of itself will be sufficient to charge the company with negligence, if it fail to make the inspection. And this is true of a company that purchases the plant of another company with respect to such plant; for its liability is not dependent on its knowledge of the pipes' defective condition, or escaping gas; but upon its care in keeping the pipes in a reasonably safe condition, and using them so as not unnecessarily to injure persons and their property. It has been held that it is a question for the jury whether a gas company which had no system of inspection, but waited for complaints before ordering an inspection, to detect a leak in the pipes, is chargeable with negligence. In a Pennsylvania case [Koelsch v. Philadelphia Co., 152 Pa. 355,

25 A. 522, 18 L.R.A. 759, 34 Am.St.Rep. 653] it was said: "While no absolute standard of duty in dealing with such agencies can be prescribed, it is safe to say, in general terms, that every reasonable precaution suggested by experience and the known dangers of the subject ought to be taken. This would require, in the case of a gas company, not only that its pipes and fittings should be of such material and workmanship, and laid in the ground with such skill and care as to provide against the escape of gas therefrom when new, but that such system of inspection should be maintained as would insure reasonable promptness in the detection of all leaks that might occur from the deterioration of the material of the pipes or from any other cause within the circumspection of men of ordinary skill in the business. It requires nothing unreasonable—it does not require that the company shall keep up a constant inspection all along its lines, without reference to the existence or non-existence of probable cause for the occurrence of leaks or escape of gas."

"It is not only the duty of the gas company to institute and maintain an efficient system of over sight and superintendence, but to be prepared with sufficient force ready to put in action and fully competent to supply and furnish a prompt remedy for accidents, defects and the like. This rule requires the company to take all necessary steps to prevent damages that may be occasioned by a leak as soon as it has knowledge of it; and, as elsewhere stated, it may be guilty of negligence in not discovering such leak."

"Gas companies are chargeable with notice of the fact that the tendency of gas escaping from their mains in the street is to follow the supply pipe into the house supplied, especially where the soil is not packed closely around such supply pipe; that it has the same tendency to follow their mains; that when it enters a sewer it will follow that into the houses and that it will even percolate the soil, thereby reaching cellars and rising to other parts of the building. Gas may follow pipes for long distances, and through these avenues find its way into buildings, there exploding without any seeming connection between the place of its escape and the place of explosion. In all such instances the original negligence is either failure to detect the leak or else the use of such pipes as in which in all reasonable likelihood leaks will occur."

On the question of duty of inspection the following quotation from 25 A.L.R., page 267, is pertinent:

"A gas company not only must see that its pipes and fittings are of such material and workmanship, and are laid in the ground with such skill and care, that gas will not escape therefrom when new, but it must maintain such a system of inspection as will insure reasonable promptness in the detection of leaks that may occur from the deterioration of the material of the pipes, or from any other cause within the circumspection of men of ordinary skill in the business; and a failure to take such precaution is negligence."

In Louisville Gas Co. v. Guelat, 150 Ky. 583, 150 S.W. 656, 658, 42 L.R.A.,N.S., 703, our Kentucky Court of Appeals laid down the rule in the following language:

"The authorities are uniform in holding that it is incumbent on it to use ordinary care in inspecting its mains, and that the failure to inspect at reasonable intervals is evidence of negligence. Here there had been no inspection from August to April, and it was a question for the jury whether ordinary care had been used. See 14 Am. & Eng. Encyc., 937; 2 Lawson's Rights and Remedies, § 577; 20 Cyc. 1172-1174, and cases cited."

See also, Woodburn v. Union Light, Heat & Power Co., 164 Ky. 29, 174 S.W. 730, 731, wherein the Kentucky Court of Appeals quotes with approval the following language from Sipple v. Laclede Gas Co., 125 Mo.App. 81, 102 S.W. 608:

"In an action against a gas company for injuries occasioned by escaping gas, prima facie proof of negligence is made by showing the break or leak in the main and the consequent escape of gas operating proximately to cause the loss."

In addition to these authorities I feel that the case of Warfield Natural Gas Co. v. Wright, 246 Ky. 208, 54 S.W.2d 666, is directly in point. A reading of that ex-

tended opinion with its list of citations is convincing of the law applicable to the facts as I find them here. See also, Union Light, Heat & Power Co. v. Heving, 250 Ky. 223, 62 S.W.2d 789.

I must therefore conclude that the plaintiff has sustained the burden of proof and is entitled to recover. The amount of damages must be gauged by the age, health, earning power and opportunities of the deceased. She was a young Negro woman in good health and earning approximately $75 per month. Her expectation of life was 26.91 years. However, I believe the Court should take into consideration the insecurity of the kind of employment she followed and her limitations to be assured of permanent remunerative work.

I fix the damage to her estate at $15,000, which will include all expenses of the estate to which the administrator is in law entitled.